Joseph D. PUTNAM, John W. Crawford, Walter Thompson, and other persons similarly situated, Plaintiffs and Respondents,

v.

V. V. DICKINSON and Lemuel Anton Braunagel, Defendants and Appellants.

No. 8272.

Supreme Court of North Dakota.

April 19, 1966.

Duffy & Haugland, Devils Lake, for defendants and appellants.

Traynor & Traynor, Devils Lake, for plaintiffs and respondents.

TEIGEN, Chief Justice.

This is an action by Joseph D. Putman, John W. Crawford, and Walter Thompson, as well as in behalf of other persons similarly situated, against V. V. Dickinson and Lemuel Anton Braunagel. By this action the plaintiffs seek declaratory relief determining the legal relations between the parties and the status relative to an area of land referred to as Maherwood Park and two strips abutting on each side thereof. This parcel of land is a part of a development area in which the plaintiffs are the owners of lots bordering on either side of the subject parcel. The plaintiffs also seek a permanent injunction restraining and enjoining the defendants from interfering with or preventing their use of the subject parcel for private park purposes with ingress and egress thereto from their respective lots. The trial court rendered judgment in favor of the plaintiffs. This appeal is prosecuted from that judgment, and a trial de novo is demanded.

In 1954 one Howard Maher announced through advertisements published in the Devils Lake Daily *Journal,* the Devils Lake *World*, and the Grand Forks *Herald* that the Maher Trust was opening a planned, suburban-type development for the construction of family homes. These advertisements contain a map of the development, part of which depicts two areas marked "PARK." These park areas are girded by strips which are apparently intended as streets or alleys, although no words designating them as such appear on the map. A row of lots is situated on the west and east sides of the park areas, separated therefrom by the strips mentioned. These advertisements also contain the following statement: "Part of the area is reserved for an elementary school and three permanent park areas are provided to purchasers of lots." The map depicted in these advertisements was not filed for record.

Nothing further appears to have been done with the property until 1956 when Maherwood Park Subdivision and Evergreen Lane were platted. The pertinent part of this plat depicts a private street running parallel to the quarter line. Lots 1 through 10 of Maherwood Park Subdivision lie contiguous to and east of the private street. No park areas, such as those included in the 1954 advertisements, are shown on this plat, nor is there any reference to any such areas in the proprietor's

certificate. This plat was filed for record in the office of the Register of Deeds of Ramsey County in 1956.

Lots were then sold and sales promoted through further advertisements. These advertisements cover the period of 1956 to 1958, and in each of them the development is referred to as Maherwood Park. There is no mention in these advertisements concerning any park areas.

A plat of Melody Lane Subdivision was filed in the office of the Register of Deeds of Ramsey County on November 6, 1958. This plat also shows Maherwood Park Subdivision, which was platted in 1956. The salient part of this plat is reproduced here.

Although the plat differs in certain particulars, it bears a striking resemblance to the map contained in the 1954 advertisements. The area in dispute comprises the

two rectangular tracts designated as "MA-HERWOOD PARK" as well as the twenty foot strips abutting on either side thereof. According to the sectional description contained in the proprietor's certificate accompanying this plat, Melody Lane Subdivision encompasses that area lying east of and contiguous to Maherwood Park Subdivision. Thus, Maherwood Park and the twenty foot strips adjacent thereto, the areas involved in this litigation, are by this description made a part of Melody Lane Subdivision.

In 1962 property owners began proceedings for the annexation of Maherwood Park Subdivision, Melody Lane Subdivision, and Evergreen Lane Subdivision into the City of Devils Lake. All three of these subdivisions were platted by Maher. In the deeds given to these owners, Maher had covenanted to construct and maintain roads and streets. The petition to annex the area, filed with the City Auditor on July 9, 1962, contains three agreements which were circulated by lot owners and presented to the City. Each agreement provides that the property owners will waive any claims against Maher for the maintenance of any streets or alleys within these subdivisions in the event he should dedicate them for public use. The phrases "and alleys" and "or alleys" have been stricken wherever they appear in these agreements. John Crawford, one of the plaintiffs testified on cross-examination that the property owners had the agreements drawn up to relieve Maher of any obligation to maintain the streets and alleys. Crawford further testified that when he signed the agreement none of the words had been stricken.

On July 11, 1962, Maher executed a dedication of the streets in the area. No mention is made therein of any alleys, and the streets dedicated are described with particularity.

Defendants Dickinson and Braunagel claim title to Maherwood Park by virtue of a warranty deed from Maher dated April 3, 1964. The land conveyed by this deed is described as "Lots Eleven and Twelve of Melody Lane Subdivision of Maherwood Park and Maherwood Park." A short time after the defendants acquired title to Maherwood Park, this action was commenced by the plaintiffs; thereafter, the defendants obtained a quit claim deed from Maher dated June 5, 1964, to the twenty foot strips abutting Maherwood Park.

The amended complaint contains the following allegations:

## I.

That this action is brought on behalf of the plaintiffs as well as on behalf of each and all other persons similarly situated who are the owners of property described as Lots One through Ten in Maherwood Park Subdivision and Lots One through Ten of Melody Lane Subdivision, which subdivisions are adjacent to Maherwood Park in the City of Devils Lake, Ramsey County, North Dakota. That such persons are so numerous as to make it impracticable to bring them all before the Court; and the right which is the subject of this action, is common to all of the owners of said property.

## II.

That the plaintiff, Joseph D. Putnam, is the owner of Lot Two (2) of Melody Lane Subdivision in the City of Devils Lake, Ramsey County, North Dakota. That the plaintiff, John W. Crawford, is the owner of Lot Five (5) in Maherwood Park Subdivision to the City of Devils Lake, Ramsey County, North Dakota. That the plaintiff, Walter Thompson is the owner of Lot Three (3) in Melody Lane Subdivision of the City of Devils Lake, Ramsey County, North Dakota. That all of the plaintiffs herein are residents, electors and taxpayers of the City of Devils Lake, Ramsey County, North Dakota.

## III.

That the property owned by the plaintiffs was subdivided by Howard Maher,

Trustee, who acknowledged the same before a person authorized to take acknowledgments, and caused the same to be filed in the Office of the Register of Deeds of Ramsey County, North Dakota, on November 6, 1958, and recorded therein in Book 4 of Plats on page 136. That said plat discloses that Maherwood Park is situated between Maherwood Park Subdivision and Melody ·Lane Subdivision; and that Maherwood Park is an open, undivided area, except for one forty foot street which divides the same into 600 foot area and another 400 foot area. That Maherwood Park is not divided into lots in said plat.

### III. (a)

That located on the east and west sides of Maherwood Park are two twenty foot alleys or streets. That said streets lie between the property owned by the plaintiffs and Maherwood Park. That said twenty foot streets have never been vacated by any proceedings instituted by the defendants or any other parties.

### IV.

That the plaintiffs, and other persons similarly situated, purchased lots in Maherwood Park Subdivision and Melody Lane Subdivision in reliance upon the plat herein described, and upon public announcements in the newspapers inviting purchasers to invest in said lots, which announcements represented that the Park area was a permanent park to be provided to the purchasers of lots.

### V.

That Maherwood Park contains many highly desirable trees and shrubs that are well established, many of which have been growing for over forty years.

### VI.

That the defendants have threatened to subdivide Maherwood Park, and have employed an engineer for that purpose, and drawn a plat, subdividing the area. That the defendants propose to construct certain streets and to subdivide Maherwood Park into twelve lots for building purposes. That the use of said premises by the defendants as proposed would destroy Maherwood Park as a park area; and necessarily result in the destruction of many valuable trees and shrubs, all to the detriment of the plaintiffs herein. That the defendants have also threatened to use the twenty foot streets on each side of Maherwood Park for private purposes, to subdivide said streets and sell them as a portion of certain lots in the development proposed by the defendants.

### VII.

That upon information and belief, affiants also allege that the defendants have threatened to remove the trees and shrubbery located in Maherwood Park so as to reduce said area to an open field, through the use of bulldozers and other earth moving machines. That said action on the part of the defendants would greatly damage the plaintiffs and constitute a breach of the covenants which the plaintiffs have in said Maherwood Park.

### VIII.

That the plaintiffs have no plain, speedy, or adequate remedy at law for relief against the proposed actions on the part of the defendants as hereinbefore set forth.

### IX.

That no proceedings have been instituted by the defendants to vacate said plat, or any portion thereof. That the defendants claim certain interests in the property by virtue of a Warranty Deed from Howard Maher, Trustee, dated April 3, 1964, and filed for record in the Office of the Register of Deeds of Ramsey County, North Dakota, on April 6, 1964, at 2:45 p. m. and recorded in said Office in Book 62 of Warranty Deeds on page 508.

WHEREFORE, Plaintiffs pray:

1. That the Court enter Judgment declaring the rights of the parties, and that the plaintiffs be adjudged to have protective covenants in said Maherwood Park prohibiting the use of said area for any purpose other than park usages.

1.a. That the Court enter Judgment declaring the rights of the parties in and to the twenty foot streets located on either side of Maherwood Park, which streets abut plaintiffs' properties.

2. That a temporary injunction issue restraining and enjoining the defendants, and each of them, from proceeding with the subdivision of Maherwood Park and the twenty-foot streets on either side thereof as the defendants have proposed, and further enjoining and restraining the defendants from removing any trees or shrubbery in said area or from constructing any roads or other structures during the pendency of this action.

3. That a permanent injunction issue restraining and enjoining the defendants, and each of them, and their heirs, successors and assigns, from utilizing Maherwood Park or the twenty-foot streets on either side thereof in any manner which would violate the covenants or easements in favor of the plaintiffs as found by the Court herein.

4. That the plaintiffs have their costs and disbursements in this action together with such other and further relief as to the Court may seem just and proper.

In their answer to this complaint, the defendants admit paragraphs II and III; allege that they have insufficient information to form a belief as to paragraphs I and IV and therefore deny the same; admit that they contemplate platting for residential purposes the tract known as Maherwood Park, and in this connection, allege that the building of homes in said area will enhance the value of all property adjacent thereto; allege that Maherwood Park was never dedicated as a public park and deny that Howard Maher, trustee, or these defendants ever undertook to maintain the same as a public park, and allege that unless the same is maintained as a public park, the same will in time become a jungle of brush and stumps and will be a detriment to adjacent property; allege that defendants bought the said property from said Howard Maher, trustee, in good faith for future development, that they procured an abstract of title to said premises and had the same examined, and they were assured that the said Howard Maher, trustee, had a clear and merchantable title to said property; and pray that plaintiffs' action be dismissed and that they have their costs and disbursements herein.

The trial court rendered judgment in substantial conformity to the plaintiffs' prayer for relief, adjudging that the plaintiffs, and other persons similarly situated have a right in a form of a negative easement to Maherwood Park and the alleys adjacent thereto and are entitled to a permanent injunction restraining and enjoining the defendants, and each of them, and their heirs, successors, and assigns, from utilizing Maherwood Park and the alleys adjacent thereto in any manner which would violate the rights of the plaintiffs, and others similarly situated, to use and enjoy Maherwood Park for park purposes, and the alleys adjacent thereto for alleys.

There are four primary issues which must be decided in this appeal:

1. Was the admission in evidence of Maher's statements concerning Maherwood Park violative of the parol evidence rule?

2. Did the plaintiffs acquire easements in the disputed areas?

3. Are these easements binding upon the defendants as successors in interest?

4. Are the plaintiffs estopped from challenging the rights of the defendants by proceedings had in connection with annexation to the city?

Sixteen persons owning lots abutting Maherwood Park were called as witnesses

during the course of the trial. Some of the testimony elicited from these witnesses was admitted over the defendants' objection. The defendants maintain that every deed given by Maher spelled out not only the lot conveyed, but also the obligations assumed by him; and, having spelled out those obligations, additional ones cannot be established by parol evidence.

Section 9–06–07, N.D.C.C., provides:

Written contract supersedes oral negotiations.—The execution of a contract in writing, whether the law requires it to be written or not, supersedes all the oral negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument.

 A careful reading of this statute makes it evident that a written contract supersedes only such oral negotiations or stipulations *concerning its matter* which preceded or accompanied the execution of the instrument. We have held that this section does not preclude proof of the existence of any separate oral stipulation or agreement as to any matter on which the written contract is silent, and which is not inconsistent with its terms, if from the circumstances of the case the court infers that the parties did not intend the document to be a complete and final statement of the whole of the transaction between them. Putnam v. Prouty, 24 N.D. 517, 140 N.W. 93. The deeds in evidence do not rule out the possibility of the existence of easements in Maherwood Park and adjacent alleys in the plaintiffs. They are silent in this regard. Moreover, the existence of such easements is entirely consistent with the terms of the deeds. We have examined the cases cited by the defendants, but we find nothing therein which conflicts with the foregoing rule

Five persons who purchased lots abutting Maherwood Park from Maher testified concerning the circumstances surrounding their purchases. John Crawford testified that he was the first person to acquire a lot in Maherwood Park Subdivision. Crawford stated that in 1954 when he was planning to buy a home, the plat depicted in the advertisements circulated in that same year was called to his attention, and this is what finally prompted him to buy. During the course of their preliminary negotiations, Crawford accompanied Maher to his house where he was shown a plan of the area. On direct examination Crawford testified as follows:

Q. Now in the plat that Mr. Maher showed you, you say this was in his home?

A. This was in his home, yes.

Q. Do you recall whether there was any park area located behind the property which you were interested in?

A. Oh, yes, definitely, that was the big selling point, and then he took us out and showed us the park area and where we could build.

Q. What did he tell you about the trees and park area at that time?

\* \* \* \* \* \*

A. The park area was to remain a park and to be used by the people who purchased the property out there, and we would use it as a recreational area any way we felt was the way we wanted to use it. That is all there was to it.

Crawford further testified that after he had moved into the area, Maher designated him as a salesman, and, in that capacity, he told others who inquired concerning the lots that the park was for their use if they purchased there.

Lloyd Pederson testified that he was president of Sioux Builders, a company engaged in the lumber business, in buying lots, and in home building; and that the Company obtained four lots abutting Maherwood Park from Maher. Pederson related that at the time these lots were acquired, Maher provided a plat similar to that reproduced in this opinion from which they could sell these lots and continued:

Howard told me on all of these lots that the park was there to stay; it was there for the people to use it, that bought adjacent lots to it. He also added that they could clean up the underbrush and clean up the park themselves. He wasn't going to do it, but he would stop anyone that tried to take out any of the larger trees in that area.

Pederson also negotiated the sales of the lots and told purchasers the same thing concerning the park that Maher had told him.

Without unduly burdening this opinion with like testimony of other property owners, we think the foregoing adequately demonstrates that these people relied upon the representations of Mr. Maher when they purchased their property.

An analogous situation was before this court in Hille v. Nill, 58 N.D. 536, 226 N. W. 635. In that case one Schuldheisz platted part of a quarter section of land lying east of and contiguous to the City of Kulm as Schuldheisz's Addition and sold the unplatted part of the quarter section to Hille. Hille's property was separated from Kulm by blocks 2–9 of Schuldheisz's Addition, and Mix Street, located approximately in the center of blocks 2–9, provided Hille with access to and from Kulm. When the sale was negotiated, Schuldheisz showed Hille the plat and told him that he would have a way over Mix Street to go to and from Kulm, but the deed made no reference to the plat or any agreement with respect to the use of the street. Later a fence was erected enclosing blocks 2–9 with gates on the east and west sides thereof; and the parties continued to use Mix Street in accordance with their agreement. Sometime later Schuldheisz sold blocks 2–9 to Nill who had no knowledge of the agreement between Schuldheisz and Hille concerning the use of the gates or the street, although he knew of their use by Hille. Thereafter both Hille and Nill continued the use of the gates as before. Some trouble subsequently arose between Hille and Nill, and Nill informed Hille he could no longer drive through the street and narrowed the gates so that vehicles could not pass. In an action against Nill which followed, we discussed the relative rights of the parties in Mix Street as follows:

* * * It is true that, when Schuldheisz sold to Hille, he referred to the plat and told Hille that the purchase carried with it the right to the use of Mix Street; but this agreement was not put in the deed and was not reduced to writing. The fact that it was agreed between them that Hille should erect and maintain a gate at the east end of the street, and that Schuldheisz should erect and maintain one at the west end of the street, negatives any belief on Hille's part and any intention on Schuldheisz's part that the street should be open to the general public use. Nevertheless it resulted in the creation of an easement in favor of Hille. Though an easement may not be created by parol (see sections 5888, 5963, Comp. Laws 1913; Cole et al. v. Minnesota Loan & Trust Co. et al., supra [17 N.D. 409, 117 N.W. 354]; note, 136 Am.St.Rep. 680), one may be created by estoppel (Forde et al. v. Libby et al., 22 Wyo. 464, 143 P. 1190; section 807, Pomeroy's Eq. Jurisprudence; 19 C.J. 873). Here Hille bought his land in the light of Schuldheisz's representation that he would have a way over Mix street to and from Kulm. Pursuant to the agreement between himself and Schuldheisz, Hille, in reliance thereon, erected his buildings with reference to this street; Schuldheisz knowing and acquiescing. He used it for many years in the manner contemplated by the agreement.

This use was more than merely permissive. Under the circumstances, for Schuldheisz to deny the right of such use of the street to Hille would work a fraud upon the latter, and so he was estopped to do so.

It is true that Nill had no knowledge of this arrangement between Schuldheisz and Hille. He objected to the introduc-

tion of any evidence tending to show such oral arrangement as they may have made, and which, acted upon by Hille, resulted in the creation of the easement. He did this on the ground that he had no knowledge of it, and that, in any event, aside from other objections that might be made, he was not bound on that account. It appears, however, that at the time he bought from Schuldheisz he knew of the gates that were maintained, and knew of Hille's use of the street. In fact, he himself had oftentimes gone that way in visiting Hille. Thus he had knowledge of facts which should have put him upon notice and inquiry, and thus he is bound to the same extent that Schuldheisz was bound with respect to the creation of the easement. See Peryer v. Pennock, 95 Vt. 313, 115 A. 105, 17 A.L.R. 863; Forde et al. v. Libby et al., supra; section 688 et seq., Pomeroy's Equity Jurisprudence.

The similarity between *Hille* and the instant case is at once apparent. In *Hille* Schuldheisz represented that Hille's purchase carried with it the right to use Mix Street, and Hille purchased the property in the light of this representation. Pursuant to their agreement and in reliance thereon, Hille erected his buildings with reference to this street. Here Maher represented that Maherwood Park was for the permanent use of those who purchased lots in the area; and in reliance upon these representations, people purchased lots abutting Maherwood Park and made valuable improvements thereon.

A case which appears to be directly in point is Gardner v. Forest Lake Associates, Inc., 131 N.Y.S.2d 363 (Sup.Ct. 1952), wherein an action was brought by property owners and residents for a declaratory judgment determining their right to an easement in certain property. The defendant developer had advertised extensively that parks, playgrounds, and recreational facilities would be provided for the purchasers of its homes, and a map displayed in the developer's office designated the prop-

erty involved as "Community Park—Picnic Area—Playgrounds—Ballfield." Representations were made to the plaintiffs by salesmen in the employ of the developer that the designated land would be so used; and the plaintiffs, in reliance upon the map and express representations, purchased their homes. It was held that the plaintiffs had an easement in the property. See also 28 C.J.S. Easements § 44 (1941) and Wilkinson v. Nassau Shores, 1 Misc.2d 917, 86 N.Y.S.2d 603 (1949) wherein it is stated at page 608:

> In addition, it is well settled that where a developer of land sells lots with reference to a map on which squares or parks or beaches are designated and representations are made by the developer that such parks or squares or beaches are for the use of the lot owners, the purchasers of such lots acquire an easement in such parks, squares or beaches by implication and representation. * * *

■ The record demonstrates quite convincingly that Howard Maher represented that Maherwood Park would remain as a permanent park for purchasers of lots. This is borne out by the advertisements circulated in 1954, as well as by Maher's statements to the various lot owners who purchased directly from him. These representations, which were acted upon by individuals who purchased lots abutting Maherwood Park in reliance thereon, would estop Maher had this suit been brought against him under the authorities cited above. The defendants, however, contend that they are innocent purchasers, and, as such, the plaintiffs may not assert any rights they may have acquired in Maherwood Park and the adjacent alleys as against Maher in this action against them. This contention apparently is founded upon the allegation that there was nothing of record to indicate that the plaintiffs had any rights in the disputed areas, nor did the use to which such areas was put sufficiently apprise them of any adverse claims.

In paragraph V of his findings of fact, the district court found as follows:

That before defendants purchased any interest in the area, Dennis Jager and other parties owning property in Melody Lane Subdivision and Maherwood Park Subdivision, cleared areas of the park and used the same for recreation purposes. That several owners of property in these two areas used the twenty foot strips on either side of 'Maherwood Park' as an alley for access to the rear of the lots in Maherwood Park Subdivision and Melody Lane Subdivision. That said alleys were also used by public service companies such as television cable companies and others.

That before purchasing the property, the defendants examined the plat of the premises in the office of the Register of Deeds wherein Maherwood Park appears. That before purchasing the property, Defendant Dickinson knew of some of the usages being made of the park area by the persons living on either side thereof. That the use of Maherwood Park and the alleys adjacent thereto by the plaintiffs was of such a nature that the defendants were put on notice and inquiry as to the rights of the plaintiffs; and that, therefore, the defendants are not innocent purchasers by virtue of their failure to make inquiry.

Upon trial de novo on an appeal from a judgment, the Supreme Court must ascertain the facts from the record and, in making its determination, will give appreciable weight to the findings of the trial court. Johnson v. Davis, N.D., 140 N.W.2d 703; Bankers v. Bankers, N.D. 139 N.W.2d 143; Bolt v. Bolt, N.D., 134 N.W.2d 506; Belt v. Belt, 75 N.D. 723, 32 N.W.2d 674; Agrest v. Agrest, 75 N.D. 318, 27 N.W.2d 697.

Section 1–01–25, N.D.C.C., provides:

What deemed constructive notice.— Every person who has actual notice of circumstances sufficient to put a prudent man upon inquiry as to a particular fact and who omits to make such inquiry with reasonable diligence is deemed to have constructive notice of the fact itself.

And in City of Bismarck v. Casey, 77 N.D. 295, 306, 43 N.W.2d 372, we quoted with approval the following language from the syllabus of McHugh v. Haley, 61 N.D. 359, 360, 237 N.W. 835:

A subsequent purchaser of a servient tenement is bound to take notice of rights that may be evident upon an inspection of the premises as well as those of which he may learn by an inspection of the records, and where a reasonably careful inspection of the premises followed by inquiry would disclose the existence of an easement, the grantee of the servient tenement takes title subject to the easement to the extent that his grantor is bound thereby.

See also Hille v. Nill, supra.

Both defendants testified that they had examined the records on file in the office of the Register of Deeds and had seen the plat which we have reproduced in this opinion. This, in itself, may have been sufficient to put them on notice of the plaintiffs' rights in the disputed area. Ramstad v. Carr, 31 N.D. 504, 154 N.W. 195, L.R.A.1916B, 1160. In any event, a reasonably careful inspection of the premises followed by inquiry of the lot owners would have disclosed that they claimed that Maherwood Park was for their permanent use. Yet neither defendant investigated whether these people were asserting any rights in the area. Defendant Dickinson testified as follows on cross-examination:

Q. Well, then, Mr. Dickinson, did you make any investigation to find out what rights, if any, these people were asserting in the park? Did you talk to any of the people living on either side?

A. Pederson, Mr. Pederson, yes.

Q. And was that Lloyd Pederson?

A. Uh huh.

Q. And this was before you purchased the property?

A. No, it was after we purchased it.

Q. Did you talk to any of the people before you purchased the property?

A. No, I know very few of them out there.

Q. So you didn't think it was necessary and you didn't care to bother about talking to any of them, even when you knew they were using this property for recreation, is that right?

A. I wouldn't put it that way, you're trying to put words in my mouth, I don't like that. I checked up the abstracts with our attorney's office and they went over the plat up here in the court house. There isn't a mark against that property. Just because a bunch of kids play out there in the trees isn't going to cause you—I suppose they can take over the south of number 2, the kids are playing out there all the time, too.

MR. TRAYNOR: We will move to strike the irrelevant statements and ask that he be directed to answer the question.

(Whereupon the reporter repeated the question, lines 5 to 8)

A. That's right.

Both defendants were aware of some use of the park and alleys by adjacent property owners. They steadfastly maintain, however, that such use was inconsequential and insufficient to put them on notice. With this we cannot agree. The record is replete with evidence of user, and it is difficult to conceive how such evidence could escape their attention. It is neither necessary nor profitable to recount in detail the evidence of user by adjacent lot owners. The following testimony of Lloyd Pederson is typical:

Q. You have some of the larger pines?

A. Yes, I think we have three or four probably directly behind our lot. And the children have a playground in there; they have swings and a slide, and we have a picnic table out there of course.

Q. When were the playground devices and picnic table put in the park?

A. A year ago last spring.

Q. Be the spring of 1962?

A. Yes—'63.

Q. Pardon me. Have you maintained them since there in that location?

A. Yes.

Q. And your property is located right adjacent to a road that runs just on the north of your property?

A. Yes, it goes between Melody Lane and Maherwood Park Subdivision, 14th Avenue and 15th Avenue now.

Q. Is it therefore easy to see into your backyard and the park area behind your house?

A. I didn't understand.

Q. Is it easy to see from the road the playground equipment you have in the park area?

A. Oh, yes.

Q. Have you cleaned out any of the underbrush in the Maherwood Park itself?

A. I have cleaned out some, not right up to the north end but I have cleaned out, oh, possibly 50 feet of it back about 10 feet into the trees, cleared away from the large pines mostly.

It is apparent that the defendants thought they were entitled to rely upon the records on file in the office of the Register of Deeds and their attorney's opinion in regard thereto and were not under obligation to make inquiry. They did not understand

their full duty as prospective purchasers, but it is the performance of the duty and not the understanding of it or lack thereof that determines the rights of the parties. Their failure to perform that duty leaves them without the protection that the law affords to an innocent purchaser. Pierce Tp. of Barnes County v. Ernie, 74 N.D. 16, 19 N.W.2d 755.

In view of the facts as we find them, and giving appreciable weight to the trial court's finding, the conclusion is inescapable that the preponderance of the evidence clearly establishes that the defendants are not innocent purchasers, and, consequently, the easements are also binding upon them as successors in interest of Howard Maher.

The defendants also contend that the plaintiffs are estopped from challenging their rights by the proceedings had in connection with the annexation of the development area to the city. In this regard the defendants assert that by executing the agreement to waive the developer's covenant to maintain the streets, the plaintiffs led Maher and everyone else to believe they did not claim any dedication or rights beyond the plain words of their respective deeds.

This contention is without merit. Maher retained title to the streets and the park. The record establishes that the agreements between Maher and the lot owners were preliminary to the annexation. The covenants to construct and maintain streets were contained in the deeds conveying the lots. If, after annexation, the streets were to become public, it was desirable that the covenants be released. Maherwood Park, however, stands upon an entirely different footing. Maher had represented that Maherwood Park was to remain for the permanent use and enjoyment of abutting lot purchasers. It was not intended to become a public park. Under these circumstances there would be no reason for inducing a public dedication of Maherwood Park. The agreement to waive the covenants to maintain private streets has no relationship to the agreement reserving a platted area as a private park for the use of abutting lot owners and cannot constitute an estoppel.

Finally, the trial court decreed that the plaintiffs have a right in the form of a negative easement in Maherwood Park and the alleys adjacent thereto. We note that for purposes of use, easements are frequently classified as affirmative or negative. In Northwestern Improvement Co. v. Lowry, 104 Mont. 289, 66 P.2d 792, 794–795, 110 A.L.R. 605, the Supreme Court of Montana distinguishes between them in these terms:

> * * * Easements are sometimes divided into affirmative and negative. An 'affirmative easement' is one which authorizes the doing of acts which, if no easement existed, would give rise to a right of action. A 'negative easement' is one the effect of which is not to authorize the doing of an act by the person entitled to the easement, but merely to preclude the owner of the land subject to the easement from doing that which, if no easement existed, he would be entitled to do. 2 Tiffany on Real Property (2d Ed.) 1179–1199. The common illustration of an affirmative easement is a right of way over the land of another. The common illustrations of negative easements are the right to have light passing to one's building over another's land, and the right to have one's building supported by such land. * * *

See also RESTATEMENT OF PROPERTY, Sections 451–52 (1944). And in 2 AMERICAN LAW OF PROPERTY, Section 8.12 (Casner ed. 1952) a negative easement is described thusly:

> A negative easement does not entitle the owner of it to enter upon the servient tenement, but it does entitle him to compel the possessor of the servient tenement to refrain from doing things upon the

servient tenement that he would otherwise be entitled to do. A typical case of a negative easement is an easement of light and air. Such an easement entitles the owner of it to compel the possessor of the servient tenement to refrain from building upon that tenement in such a way as to interfere beyond a certain extent or in certain ways with the access of light to land possessed by the person entitled to the benefit of the easement. The interest protected by a negative easement is always an interest in the enjoyment of land possessed by the one entitled to the benefit of the easement. * * *

█ Since the easements in this case permit the plaintiffs and persons similarly situated to enter and do affirmative acts upon the servient tenement, they are affirmative, not negative, in nature. Accordingly, the judgment of the trial court is modified by designating the easements created as affirmative.

█ The only question remaining is the character of the twenty foot strips separating Maherwood Park from the platted lots on each side of the park. These strips are each contiguous to the park on one side and to the lots on the other. The twenty foot strips are clearly drawn on the recorded plat of Melody Lane Subdivision. They were also drawn on the maps of the development area contained in the advertisements placed in the newspapers advertising the lots for sale. However, in neither were they designated by name, number, or legend. The evidence establishes the twenty foot strips have been continuously used by the owners of the lots, telephone companies, television cable companies, delivery trucks, garbage disposal vehicles, and others who render service to the lot owners. The strips have been used as alleys since the area was first developed and lots sold to home builders. The evidence establishes they have been used in the same manner as alleys ordinarily are used in residential areas. The evidence does not disclose any oral representations made by the proprietor

relative to the purpose which the twenty foot strips are to serve and they were not included in the separate dedication of the streets as public streets by the proprietor, made at the time the development was annexed to the City of Devils Lake. The twenty foot strips were not described in the first deed conveying to these defendants the proprietor's remaining property located in the development. They were conveyed by a separate deed about two months later.

The defendants claim the twenty foot strips are not alleys or public ways but are undedicated strips of land belonging to them as successors to Maher, who platted the area without dedicating them for either a public or private purpose.

The lots are separated from Maherwood Park, in which park we have found the owners of the lots have an easement for private park purposes, by these twenty foot strips of land. This fact, together with the use to which these strips have been placed, shows an evident intention on the part of the proprietor either to dedicate the twenty foot strips to the use of the public or to afford the owners of the lots an easement across them for the purpose of allowing the lot owners ingress and egress to the area of Maherwood Park in which they have an easement.

The defendants as subsequent purchasers had knowledge of the circumstances sufficient to put a prudent man upon inquiry as to such facts. They had constructive notice of the fact for the same reasons set forth earlier in this opinion relative to the use of Maherwood Park. Further, the evidence establishes that one of the defendants on cross-examination admitted that the only logical interpretation to be placed on these twenty foot strips is that they are alleys.

The trial court found the plaintiffs were entitled to a permanent injunction restraining and enjoining the defendants from utilizing Maherwood Park and the twenty foot strips, which the trial court calls alleys, adjacent thereto in any manner which would violate the rights of the plaintiffs

and others similarly situated to use and enjoy the same for park purposes and for alleys. We concur in this decision. For the reasons aforesaid, we modify the judgment designating the easements created as affirmative and, as modified, it is affirmed.

STRUTZ, ERICKSTAD, and KNUDSON, JJ., concur.

MURRAY, J., not being a member of the Court at the time of submission of this case, did not participate.